UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ESTATE OF DONALD J. HOUSEY,
through personal representative,
MITCHELL J. HOUSEY,

    Plaintiff,

v.

MACOMB COUNTY, a municipal
corporation, MARK S. SWITALSKI,
in his individual and official capacities, and
KATHRYN GEORGE, in her individual and
official capacities,

    Defendants.

_____/

Case No. 10-11445

HON. AVERN COHN

## MEMORANDUM AND ORDER

## GRANTING GEORGE'S MOTION FOR SUMMARY JUDGMENT (DOC. 40)

## GRANTING SWITALSKI'S MOTION FOR SUMMARY JUDGMENT (DOC. 43)

## DISMISSING MACOMB COUNTY AS A PARTY TO THE CASE

## DISMISSING MACOMB COUNTY'S MOTION FOR SUMMARY JUDGMENT AS MOOT (DOC. 42)

### I. Introduction

This is a wrongful discharge case. Plaintiff Donald Housey (Housey) claims he was terminated from his position as the Macomb County probate court register[1] in retaliation for reporting misconduct by a judge of that court. Housey says he reported improprieties by Kathryn George (George), a Macomb County probate judge, to the State Court Administrative Office (SCAO). Mark Switalski (Switalski), chief judge of the Macomb County circuit and probate courts, ultimately terminated Housey. The

---

[1] The position is also called probate court administrator.

complaint is in four (4) counts;[2] (I) Violation of 42 U.S.C. §1983 Due Process; (II) Wrongful Discharge- Breach of Contract and Legitimate Expectations; (III) Violation of Michigan's Whistleblower Protection Act (WPA) M.C.L. §15.361 *et seq*; and (IV) Violation of 42 U.S.C. §1983 Free Speech. There are three defendants: George, Switalski, and Macomb County.[3] George and Switalski are sued in both their individual and official capacities.

Now before the Court are three (3) motions: George's Motion for Summary Judgment (Doc. 40), Switalski's Motion for Summary Judgment (Doc. 43), and Macomb County's Motion for Summary Judgment (Doc. 42). For the reasons that follow, George's Motion for Summary Judgment (Doc. 40) is **GRANTED**; Switalski's Motion for Summary Judgment (Doc. 43) is **GRANTED**; Macomb County is **DISMISSED** as an improper party to the case; Macomb County's Motion for Summary Judgment (Doc. 42) is **DISMISSED** as moot. This case is **DISMISSED**.

---

[2] The Court declined to accept jurisdiction of Housey's state law claims, counts (II) and (III). (Doc. 68).

[3] At oral arguments on defendants' motions for summary judgment, the Court expressed doubt as to whether Macomb County was a proper party to the case on the basis that the probate court employed Housey, not the county. The Court asked Housey and Macomb County to file supplemental briefs on this issue. (Docs. 69 & 70). Accordingly, the Court will address Macomb County separately. *Infra* §VI

## II. Background[4]

### A. Material Facts Not in Dispute

**1.**

Housey served as the register for the Macomb County probate court from November 2002 until his termination in January 2010. Housey first joined the court in 1989 as a probate attorney/referee. Pamela Gilbert O'Sullivan (O'Sullivan) was the chief judge in 2002; she appointed Housey as the probate court register. O'Sullivan described Housey's service during her tenure as chief judge as "excellent."

**2.**

In 2002, Housey ran in the primary election for the office of probate judge against five (5) opponents, including George. Housey did not garner enough votes to run in the general election. George won the primary and subsequently won the general election. George took the bench in January of 2003. Tension between Housey and George began shortly thereafter. The relationship soured permanently when Housey began to question George's appointment of a conservator group called ADDMS.[5]

**3.**

O'Sullivan enacted a policy in 2005 requiring rotational assignments from an approved list of guardians/conservators. Nevertheless, George appointed conservators from a personal list, which included ADDMS. Beginning in 2004, Housey sent in excess of twenty (20) reports to the State Court Administrative Office (SCAO) regarding George

---

[4] During the pendency of this case, Housey passed away. The Court was notified of his death (Doc. 56) and subsequently granted the motion to substitute party filed by Housey's personal representative Mitchell Housey. (Doc. 57).

[5] It is unclear if this is an acronym and if so, what it stands for.

and ADDMS, fifteen (15) of which were in 2007. Housey reported that ADDMS overbilled estates and mismanaged the affairs of the clients they represented. SCAO did not take any action on Housey's verbal or written reports.

**4.**

In 2005, SCAO commissioned the Whall Group (Whall) to complete a financial and forensic audit of the probate court's procedures and records. After its investigation, Whall issued a report outlining significant problems. Whall found procedures in conflict with statute; excessive and inaccurate billing of estates; lack of effective oversight of disbursements and conservator accountings; and mismanagement of real estate transactions. Whall made a comprehensive list of recommendations designed to improve procedure and oversight. The report also noted that personal animosity between the judges created a feeling of "awkwardness" in the court. Additionally, the report raised questions of ADDMS's practices as conservator. In response, O'Sullivan stopped assigning ADDMS as conservator to cases on her docket.

**5.**

George assumed the office of chief judge in January of 2008. George implemented changes that included reassignment of offices, restricting keys for the building and file cabinets, and requiring court employees to pass through security screening. George restricted the use of cell phones, use of court telephones, and forbade eating at a desk in view of the public. George directed Housey to complete a written daily report on his activities. During her tenure as chief judge, George issued written memoranda to Housey expressing her disapproval with his practice of whistling in court and forbade bringing donuts for some but not all court employees. George

required Housey to obtain approval before delegating any of his assigned duties or attending professional development trainings.

**6.**

In January of 2008, SCAO commissioned Whall to complete another audit of the probate court. Whall reported low employee morale, that court procedure was not uniformly applied, and that the personal animosity between George and O'Sullivan rendered the court dysfunctional. Whall found that court employees manipulated the system of random judge assignment to cases. Whall noted that an inordinate number of cases that included a recommendation for ADDMS in the initial petition were sent to George. Whall's report speculated that clerks would set aside a file with an ADDMS recommendation until George's name came up as the assigned judge, thereby subverting the random judge assignment process.

**7.**

Whall found that sixteen percent (16%) of the audited files contained the appearance of financial mismanagement, up from ten percent (10%) in 2005. Whall found noncompliance with court rules and procedure in seventy-five percent (75%) of audited cases. Additionally, the 2008 Whall report found that a substantial number of cases handled by ADDMS lacked adequate accounting for assets and income.

**8.**

In May of 2008, George placed Housey on administrative leave pending an investigation of the issues identified by the 2008 Whall report, specifically the

manipulation of the random judge assignment system. A *Loudermill*[6] hearing was scheduled and held for Housey.[7]

**9.**

The Supreme Court reacted to the 2008 Whall report by removing George as chief judge and appointing Kenneth Sanborn (Sanborn). Sanborn served as a Macomb County probate judge and circuit court judge from 1972-1990. The day after his appointment, Sanborn rehired Housey as probate court register. Shortly thereafter, the Macomb County corporation counsel closed the file on disciplinary proceedings initiated by George against Housey.

**10.**

The Michigan Attorney General conducted an investigation into matters identified by the 2008 Whall report, in particular, the practices of ADDMS. The Attorney General concluded the probate court "is struggling to operate effectively and efficiently under the weight of discord with the court."[8]

**11.**

In November 2009, the Michigan Supreme Court appointed Switalski as chief judge of the Macomb County circuit and probate courts effective January 1, 2010. In preparation, Switalski reviewed the findings of the 2008 Whall report. Switalski met with Sanborn, members of SCAO, attorneys who practiced before the probate court, George

---

[6] *Loudermill v. Cleveland Bd. of Educ.*, 470 U.S. 532 (1985) (The reference to *Loudermill* is used colloquially to describe a post-termination hearing for a civil servant affording he or she an opportunity to dispute the factual allegations that form the basis of the termination.

[7] The specifics of the hearing are not clear from the record.

[8] The findings of this investigation, if any, are not clear from the record.

and O'Sullivan. He also met with Housey on four (4) occasions. During one of his meetings with Switalski, Housey disclosed that he sent letters to SCAO and cooperated with the JTC investigation.

**12.**

In November of 2009, the JTC issued a subpoena to Housey in his capacity as probate court register, for seventeen (17) probate court files. Housey contacted Switalski for guidance; Switalski ultimately assigned the task of responding to his secretary. As part of the JTC investigation, Housey met with a JTC investigator confidentially on three (3) occasions.

**13.**

Switalski terminated Housey on January 15, 2010. At the time, Switalski declined to outline the reasons for his decision. He did comment that it was a "coach's decision." Housey requested a *Loudermill* hearing pursuant to his understanding of his rights as outlined by the 2001/2004 personnel manuals. Switalski declined his request on the basis that Housey was an at-will employee under the terms of the 2009 personnel manual.

**14.**

The 2001/2004 personnel manuals[9] established a just-cause requirement for termination and provided for a *Loudermill* hearing. Additionally, the manuals stated in relevant part "[t]he manual shall not be construed as creating a contract between the County and any of its employees." Moreover, county employees "cannot rely upon custom or prior practice" with regard to County policy and procedure. Finally, the

---

[9] Macomb County promulgated the personnel manuals. In each instance, the manuals were subsequently adopted by the probate court.

7

manual provided "personnel policies…may be added to, expanded, reduced, deleted, or otherwise modified by the County and such personnel policy modifications are solely within the discretion of the County Board of Commissioners."

**15.**

The county and probate court adopted a new personnel manual in 2009. The manual contained many of the same provisions as the 2001 and 2004 manuals. However, it removed the just-cause requirement and declared that all non-union personnel were at-will employees subject to termination at any time for any reason. The manual included a provision that continued employment with the county acknowledged the at-will nature of his/her position.

**16.**

In 2001 and 2004, the manual was distributed to each employee and required a signed acknowledgement of receipt. Housey received and signed for the 2001 and 2004 manuals. The 2009 manual, however, was not physically distributed to employees. It was posted on the county's intranet.

### III. Motions for Summary Judgment

George and Switalski move the Court for summary judgment. George argues that her acts do not qualify as adverse employment decisions. Switalski argues there is no evidence of a causal connection between Housey's protected activity and his discharge. Further, the George and Switalski contend Housey did not engage in speech protected by the First Amendment and even if he did, he was terminated for legitimate reasons. Additionally, George and Switalski argue that summary judgment in their favor is

appropriate because Housey was an at-will employee not entitled to pre-termination process.

## IV. Legal Standard

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion. *Moore v. Philip Morris Co.*, 8 F.3d 335, 340 (6th Cir. 1993); *see Anderson*, 477 U.S. at 249–50. "[C]ourts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (quotation mark omitted).

9

## V. Discussion

### A. 42 U.S.C. §1983 First Amendment Retaliation

Housey says he suffered retaliation for exercising his First Amendment rights. Housey asserts his reports to SCAO, the JTC, and the Michigan Supreme Court are protected speech. Housey argues his treatment under George's tenure as chief judge, his suspension, and his termination all constitute retaliation. A successful First Amendment retaliation claim requires Housey to show (1) he engaged in constitutionally protected speech, (2) he suffered an adverse action that would deter a person of ordinary firmness from engaging in the speech, (3) the adverse action was motivated at least in part by the protected speech.

#### 1.  Protected Speech: Citizen or Employee

When the government acts an employer, it has broader authority to regulate the speech of its employees than it does to regulate the speech of citizens. *Garcetti v. Ceballos*, 547 U.S. 410, 411 (2006). However, a public employee does not surrender his First Amendment rights as a condition of employment. *Connick v. Myers*, 461 U.S. 138, 142 (1983). A public employee retains his right as a citizen to speak on matters of public concern. As such, to qualify as protected speech Housey must have spoken in his capacity as a citizen rather than in his capacity as probate court register. *Pickering v. Board of Ed.*, 391 U.S. 563, 574 (1968).

The Supreme Court held in *Garcetti* that actions taken as part of an employee's official duties were not protected speech. Garcetti involved a prosecutor (Ceballos) who wrote a memorandum recommending dismissal of a criminal case based on a faulty affidavit to a search warrant. Ceballos' supervisors disagreed and prosecuted the case.

At trial, the defense attorney called Ceballos as a witness to relate his observations about the inaccuracies in the warrant's affidavit. Ceballos' supervisors subsequently retaliated against him. The Supreme Court held Ceballos did not engage in constitutionally protected speech because he did not speak in his capacity as a citizen. The Supreme Court considered the fact that Ceballos' speech occurred within his office and on the subject matter of his employment, although noted that those factors were instructive but not dispositive. The Supreme Court concluded that making decisions on which cases to prosecute fell squarely within Ceballos' responsibilities as a prosecutor, thus, he was not speaking in his capacity as a citizen.

Similarly, Housey's had an obligation to report violations of the law and court rules to SCAO. SCAO is the administrative arm of the Supreme Court, which oversees the state courts in Michigan. Housey's reports occurred within the framework of SCAO's oversight. The same is true for reports to the Michigan Supreme Court. Likewise, Housey's interviews with JTC investigators were part of an affirmative duty to cooperate with JTC investigations. M.C.R. 9.208(B). Housey would have been derelict in his duties not to report irregularities or cooperate with investigators. Because Housey's reports were a requirement of his job, he was not speaking as a citizen; therefore, Housey did not engage in protected speech.

### 2. Matter of Public Concern

The second hurdle Housey must overcome is to show his speech "touched on a matter of public concern." "Whether or not an employee's speech addresses a matter of public concern must be determined by content, form, and context. *Connick v. Myers*, 461 U.S. 138, 147 (1983). "In general, speech involves matters of public concern when

11

it involves "issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983). Such matters of public concern are to be contrasted with internal personnel disputes or complaints about an employer's performance."

The issues Housey raised were documented in the public record and readily accessible for review by bodies charged with oversight of the probate court and its personnel. Indeed, this review happened several times over. The information Housey disclosed was available for the informed decision making of the public in the absence of his reports.

The record reflects a significant personality conflict and animosity between Housey and George. *Connick* held that internal personnel disputes did not rise to the level of public concern even when it implicated the functioning of a public office. The plaintiff in *Connick,* Myers, was an assistant district attorney. Myers grew upset after her supervisors transferred her to a different division within the office. Myers circulated a survey to other employees ostensibly to gauge employee morale and confidence in the leadership of the office. Myers' supervisors saw the survey as an attempt to sow discord and gather ammunition for her personal grievances; she was terminated. The Supreme Court held that Myers' speech did not qualify as a matter of public concern. Housey's situation similarly involves personal animosity and disagreement with his employer. *Connick*, 461 U.S. at 168. However, Housey's case presents a more difficult question because were not purely personal.

A recent Sixth Circuit decision considered the scope of what constitutes a matter of public concern. *Mosholder v. Barnhardt*, No. 10-2586, __F.3d__, 2012 WL 1650477 (6th Cir. May 11, 2012). Mosholder was a Michigan corrections officer. To Mosholder's chagrin, the prison administration organized rap competitions for the inmates. Mosholder wrote several state representatives and state senators to complain. Mosholder's framed her comments as concern for the effective administration and safety of the prison. The Sixth Circuit panel held Mosholder spoke on a matter of public concern.

*Mosholder* presents several parallels to Housy's case. Both cases involved the effective operation of a public facility and both concerned perceived impropriety by the management of those institutions.

However, the content, form, and context of Housey's do not support the same conclusion reached by the *Mosholder* panel. In *United States v. National Treasury Employees Union,* 513 U.S. 454, 467 (1995) the Supreme Court ruled the employees speech touched on a matter on public concern, in part, because the "content [was] largely unrelated to their government employment." The content of Housey's speech was fully in the purview of his government employment. Further, Housey's speech was not directed to a public forum (for example, an elected official, newspaper, or interest group); the form and context of his speech fell squarely within the framework of the administrative system of the court. Housey's complaints reflect internal grievances rather than a matter of public concern.

**B. Due Process: Just-Cause or At-Will Employment**

13

Housey's due process claim turns on whether or not his employment was at-will or just-cause. The due process clause of the Fourteenth Amendment provides procedural due process to public employees with a protected property interest in continued employment. *Cleveland Board of Edu. v. Loudermill*, 470 U.S. 532, 538 (1985). A public employee has a property interest in continued employment when the existing rules, policies, or understandings from an independent source amount to an implied promise of continued employment. *Woolsey v. Hunt*, 932 F.2d 555, 561 (6th Cir. 1991). The parties do not dispute that the 2001/2004 manuals provided for just-cause termination and a *Loudermill* hearing. Pursuant to the so-called handbook exception, a written just-cause policy can create an enforceable implied promise of continued employment. *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 579 (1980). The parties do not dispute that the 2009 manual provides that all non-union employees serve on an at-will basis. However, the parties disagree which manual governs their employment relationship.

### 1. Property Interest

First, just-cause employment was both the policy and the practice of the probate court prior to 2009. After Housey's suspension in 2008, he was given a *Loudermill* hearing to dispute the factual basis of his suspension/termination. The 2001/2004 personnel manuals provide for just-cause employment. As such, Housey had a property interest in continued employment, at least until 2009. Whether or not Housey's employment was just-cause or at-will after 2009 depends on whether the 2009 personnel manual effectively changed his employment from just-cause to at-will. The Supreme Court of Michigan holds that an employer may unilaterally change the terms of

employment from just-cause to at-will, even when the right to do so was not expressly reserved. *In Re Certified Question*, 432 Mich. 438 (1989). Although to be effective, the employee must have had reasonable notice of the change. *Id*.

### 2. Notice

Housey says the probate court (by way of the county), failed to give reasonable notice of the policy change from just-cause to at-will. The county and probate court adopted the 2009 manual but did not require employees to sign for receipt, as was the practice in 2001 and 2004. George and Switalski say that the manual was available on the county's intranet. An opinion of this court holds that notice may be affected by a uniform and reasonable distribution policy of the personnel manual. *Transou v. Electronic Data Sys.*, 767 F. Supp. 1392, 1399 (E.D. MI 1991). George and Switalski have not sufficiently described a uniform and reasonable distribution policy. Rather, George and Switalski explain that the manual was available but not that they ever issued an announcement, publically explained the change, or that it was conspicuous. Accordingly, the probate court did not provide adequate notice of the shift from just-cause to at-will employment. Because Housey did not have notice of the change in 2009, he cannot be bound by its terms. *See In Re Certified Question*, 432 Mich. at 445; *see also Toussaint,* 408 Mich. at 579 (explaining notice is required to effectively change just-cause to at-will employment).

### 3. M.C.L. §600.833

Looking only at the efficacy of the 2009 manual, Housey would have a right to just-cause employment. However, the office of probate register is created and governed by statute and therefore the Court must consider its effect. M.C.L. §600.833. Section

600.833 provides "[t]he probate register shall hold office until his appointment is terminated by the probate judge or chief judge." Switalski argues that this confers unfettered authority in the chief judge to dismiss the register for any reason. Housey argues that Switalski's discretion is constrained to just-cause by the personnel policies of the county.

The Michigan Supreme Court considered a situation strikingly similar to Housey's in *Chamski v. Cowan*, 288 Mich. 238 (1939). The chief judge of Wayne County Circuit Court appointed Chamski as probate register in 1935. The predecessor statute to §800.833 read:

> [i]n every county in this state the judge of probate may appoint a probate register who shall hold such office during the term for which the judge of probate making the appointment shall have been elected unless sooner removed by the judge of probate. M.C.L. §13875 (1929).

Probate judges served four (4) year terms. However, at the time Chamski was probate register the chief judge held office for one year. The chief judge who took office the year following Chamski's appointment asked him to resign. Chamski argued that because he was appointed for a fixed term (four years) he could only be removed for-cause after a hearing. The *Chamski* Court disagreed and ruled, "unrestricted power of removal expressed in a statute gives authority to dismiss without assigning any cause." *Chamski*, 288 Mich. at 250. The Michigan Supreme Court interpreted the statutory language "unless sooner removed by the judge of probate" as placing removal within the discretion of the chief judge. Similarly, M.C.L. §600.833 provides "[t]he probate register shall hold office until his appointment is terminated by the probate judge or chief

16

judge." Section 600.833 vests authority in the chief judge to hire and fire the probate register without restriction.

Nevertheless, Housey argues that M.C.L. §600.837 requires the probate judge to abide by county policy; in this case, just-cause. The Michigan Supreme Court rejected this argument in *Judicial Attorneys Ass'n v. State*, 459 Mich. 291 (1998). *Judicial Attorneys Ass'n* considered the constitutionality of a law granting the county authority to manage certain court policy and its personnel. The Michigan Supreme Court found the provisions unconstitutional as a violation of the doctrine of separation of powers.

While Michigan courts recognize that the *Toussaint* handbook exception applies to public employees it also cautions that a "public employee cannot claim an implied contract where it violates the controlling body's statutory authority." *Thorin v. Bloomfield Hills Bd. of Edu.*, 203 Mich. App. 692, 700 (Mich. Ct. App. 1994). Accordingly, when county policy conflicts with the statutory authority of the chief judge the statute governs. The county's policy and practice of just-cause employment did not alter the statutory authority of the chief judge to hire and fire the probate court register.

## VI. Macomb County as Housey's Employer

Macomb County is a party to this case under the theory that it was Housey's employer. Despite the operational overlap between the court and county, Macomb was not Housey's employer. Circuit and district courts in Michigan receive their funding from the locality they serve. Although ostensibly separate, in practice, counties and cities compliment and supplement the operation of the courts in their jurisdiction. For example, Macomb County's department of human resources handled the payroll, benefits, vacation, and sick time of probate court employees. Further, the probate court

adopted the employment policies set by the county and relied on the advice of its corporation counsel. In addition to providing funding, Macomb County approved the court's budget and set Housey's salary. The overlap and integration of operations might give the appearance that Macomb County employed Housey; it did not.

The Michigan Supreme Court squarely addressed whether or not a county may employ court personnel in its jurisdiction. The Michigan Supreme Court stated that despite the unique relationship between a court and its funding unit, the judiciary was the employer of court personnel, not the county. *Judicial Attorneys Ass'n*, 459 Mich. at 302-03. To find otherwise would violate the separation of powers. The Michigan Supreme Court explained "[t]he practical necessity for the judiciary to reach accommodation with those who fund the courts on an annual basis, however, cannot, as a constitutional matter, be used as an excuse to diminish the judiciary's essential authority over its own personnel. *Id.*

Even absent the separation of powers problem associated with the employment of court personnel, Macomb County does not hire, fire, or supervise the probate court register; that function is reserved by statute for the chief judge. *See* M.C.L. §600.833 *et seq.* Nevertheless, Housey cites to *Turppa v. County of Montmorency*, 724 F.Supp.2d 783 (E.D. M.I. 2010) to stand for the proposition that a county can be a "co-employer" of a judicial employee. The co-employer theory articulated in *Turppa* appears to depart from Michigan Supreme Court precedent.

For example, in resolving a dispute as to who employed district court personnel, the Michigan Supreme Court explained, "[e]mployees of the district court are employees of the judicial district, an administration unit of the State's one district court, which in turn

is a subdivision of Michigan's one court of justice. They are not employees of the county, city or other district control unit, even though they are paid by the district control unit." *Judges of 74th Judicial Dist. v. Bay County*, 385 Mich. 710, 723 (1971). *See also, Ottawa Co. Controller v. Ottawa Probate Judge*, 156 Mich. App. 594 (Mich. Ct. App. 1986). Accordingly, Housey's employer was the probate court, not Macomb County.

**SO ORDERED.**

Dated: May 15, 2012

s/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, Tuesday, May 15, 2012, by electronic and/or ordinary mail.

s/Julie Owens
Case Manager, (313) 234-5160